In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3601

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KENNETH GAYTAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 815—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED NOVEMBER 29, 2010—DECIDED AUGUST 12, 2011

Before BAUER, WOOD, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* Kenneth Gaytan was indicted for distribution of crack cocaine based on two controlled buys arranged by the Federal Bureau of Investigation in which Gaytan sold substantial quantities of crack to a confidential informant named James Worthen. The FBI captured the negotiations and both transactions on audio recordings. Agents also conducted visual and video surveillance of the controlled buys, but because of gaps in this surveillance, they did not actually see—and

the video recordings do not show—money and drugs changing hands. Nor did the government produce Worthen to testify at trial. So in this sense the case against Gaytan was circumstantial.

Before each transaction agents equipped Worthen with buy money and an audio-recording device, and they watched as he approached Gaytan at the prearranged meeting places. On both occasions, however, Worthen got into Gaytan's car—out of the agents' sight and the surveillance video's range. What the two *said* to each other was audio-recorded, but what they *did* had to be inferred. After each transaction Worthen returned to the agents minus the money but in possession of the agreed-upon quantity of crack cocaine. On the strength of the audio recordings and testimony from the case agents, a jury convicted Gaytan of two counts of distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1).

Gaytan appeals, challenging the sufficiency of the evidence to sustain his convictions. He also claims that two of Worthen's recorded statements were testimonial hearsay, and the government's use of them at trial violated his Sixth Amendment right of confrontation as explained in *Crawford v. Washington*, 541 U.S. 36 (2004). He also mounts a nonconstitutional challenge to the government's use of these statements; he argues that allowing the case agents to testify about Worthen's recorded statements was unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. Finally, Gaytan claims that Michael Moreland, one of the FBI agents, gave expert testimony about some drug jargon

heard on the recordings without first having been disclosed or qualified as an expert witness.

We reject these arguments and affirm. The evidence presented at trial was easily sufficient to sustain Gaytan's convictions. There was no Confrontation Clause violation; the two recorded statements Gaytan challenges were offered for context, not for their truth. The FBI agents' testimony about the recordings was not unfairly prejudicial. Finally, the challenged portion of Agent Moreland's testimony did not amount to expert opinion; even if it did, admitting it was not plain error.

## I. Background

On two separate occasions in 2006, the FBI arranged for its confidential informant James Worthen to make controlled purchases of crack cocaine from Gaytan. On March 8, 2006, FBI Special Agent Jennifer Hall searched Worthen and equipped him with audio- and video-recording devices and a transmitter. Under FBI surveillance Worthen approached Gaytan's home in Chicago and called for him; Gaytan came out and together they walked down the block. Worthen told Gaytan, "My brother just came with some dude who's tr-, trying to get two ounces of rock." Gaytan responded, "What you need?" Worthen clarified, "I'm trying to get, f—ing um, a couple O's of rock, man." Gaytan replied, "Where the loot at? . . . I'll give it to you for six bills, dog." Gaytan added, "[I]f you would'a came last night I would'a hit you with a ball, man." When Worthen told Gaytan he needed to go get the money, Gaytan responded, "Come on, I'll be here."

FBI agents again searched Worthen and gave him $1,200 in buy money to complete the drug transaction with Gaytan. Worthen then met with Gaytan in Gaytan's car. The agents could not see the two in the car but were able to hear the conversation through the transmitter. Gaytan expressed concern that "[t]he po-lice" were "watching [his] crib" and told Worthen to meet him at another location. The agents later observed Worthen waiting at the agreed location and watched him again get into Gaytan's car. Gaytan then explained to Worthen, "[O]ne is, is regular, like six hundred . . . another one is better. You, this is smoking cane, right?" Worthen answered, "Yeah . . . that's what they want."

Later in the conversation, Gaytan again asked Worthen, "Where the loot at?" Worthen responded, "Right here . . . (counting money) Six. So you're going to get the other one right now too?" Gaytan replied, "Yeah." At this point the sound of the car door opening and closing can be heard. After a few minutes, Gaytan is heard reentering the car and saying, "This one's good. That one's gonna have you on your ass." Worthen then left the car and reported back to the agents, giving them two ounce-size quantities of crack cocaine. The agents again searched Worthen and found no money or other drugs.

The FBI arranged for Worthen to make a second controlled purchase from Gaytan on April 19. The day before this transaction, April 18, the agents recorded a phone conversation in which Worthen asked Gaytan, "[D]o you remember when I came over there with my brother and them, and I got those two big ones from you?"

Gaytan responded, "Yeah." Worthen told Gaytan that he would like to make a similar purchase the next day, and Gaytan said to call him. In another recorded call on April 19, the two arranged to meet at a park. As in the earlier transaction, before the meeting FBI agents searched Worthen, supplied him with buy money, and equipped him with an audio and video recorder and a transmitter. He then entered the park to meet Gaytan. Gaytan asked Worthen, "How much you got?" Worthen replied, "How much is it?" Gaytan answered, "It's like, seven fifty." Gaytan then told Worthen to wait while he went to get his car.

Agents observed Gaytan leave the park and then pull up in his car. Worthen got in and Gaytan drove to his home. When they arrived, Gaytan said, "Hold on, I'll go get some squares." Noises on the recording indicate that Gaytan got out of the car and then returned. He then moved his car to a nearby alley. Surveillance agents, including Moreland, observed this maneuver. Gaytan then told Worthen, "[J]ust get the money ready, I'll go get it." More noises on the recording indicate that Gaytan left the car, returned, and then said, "It's right there . . . . [I]t's right there in the alley." Finally, Gaytan is heard dropping Worthen off and driving away from the alley. The agents followed Worthen to a prearranged meeting spot where he gave Agent Moreland two ounce-sized quantities of crack; again, he no longer had the buy money.

A grand jury returned an indictment charging Gaytan with two counts of distributing more than 50 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). At

trial the government introduced portions of the audio and video recordings from the two controlled buys and the audio recordings of the phone calls setting up the April 19 transaction. Agents Hall and Moreland also testified about their role in setting up and observing the controlled buys. From time to time during their testimony, the agents were asked about what they heard on the recordings. As relevant to Gaytan's argument here, Agent Moreland explained that he knew that the April 19 controlled buy would involve two ounces of crack cocaine because during the April 18 phone call, "[Worthen] initially asked for 'two big ones' and referred to a previous drug purchase on March 8th, 2006," which involved the same quantity. At several points during the trial, the court instructed the jury that Worthen's recorded statements were not to be considered for their truth, but rather to provide context for Gaytan's recorded statements.

The government also called several expert witnesses. A chemist from the Drug Enforcement Administration testified that she tested the substances involved in the controlled purchases and confirmed that they contained cocaine base. She also testified about drug weight; she said the crack recovered on March 8 weighed 49.1 grams and the crack recovered on April 19 weighed 53.3 grams. DEA Officer Robert Coleman also testified as an expert in narcotics trafficking. He identified the substances recovered on both dates as crack cocaine based on their appearance and smell. He also offered testimony interpreting some of the coded language heard in the recordings. He said that "rock" meant crack cocaine, "smoking cane" referred to getting high with crack

cocaine, "O" referred to an ounce of crack, and "eight-ball" meant one-eighth ounce of crack.

The jury convicted Gaytan on both counts and found that he distributed more than 5 but less than 50 grams of crack cocaine on March 8, 2006, and more than 50 grams of crack cocaine on April 19, 2006. The district court sentenced Gaytan to concurrent terms of 125 months on each count.

## II.  Discussion

Gaytan raises three arguments on appeal. First, he claims the evidence was insufficient to sustain his convictions. Second, he argues that two of Worthen's recorded statements were testimonial hearsay and their admission violated the Confrontation Clause. Relatedly, he claims that the FBI agents' testimony about Worthen's recorded statements was unfairly prejudicial and should have been excluded under Rule 403. Finally, Gaytan argues that Agent Moreland gave an expert opinion interpreting some coded language on the recordings but was neither disclosed nor qualified as an expert witness.

### A.  Sufficiency of the Evidence

In an appeal challenging the sufficiency of the evidence, "we view the evidence presented at trial and draw all reasonable inferences from that evidence in the light most favorable to the government." *United States v. Rea*, 621 F.3d 595, 607 (7th Cir. 2010). Reversal is appropriate

" 'only when the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt.' " *United States v. Sanchez*, 615 F.3d 836, 842 (7th Cir. 2010) (quoting *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002)).

To convict Gaytan on the two crack-cocaine charges in the indictment, the jury was required to find the following elements beyond a reasonable doubt: (1) that Gaytan knowingly and intentionally distributed a substance containing cocaine base to Worthen on March 8 and April 19; and (2) that he knew he was distributing a controlled substance on both occasions. *United States v. Mendoza*, 510 F.3d 749, 752 (7th Cir. 2007) (citing 21 U.S.C. § 841(a)(1)). Gaytan's argument turns on the government's failure to produce Worthen to testify at trial. Because none of the FBI agents actually saw drugs or money change hands, he insists there was a critical gap in the evidence—a gap only Worthen could fill. Gaytan claims that to carry its burden of proof, the government needed to call Worthen to testify.

It is true that the FBI agents did not personally observe Gaytan take the buy money from Worthen and give Worthen crack cocaine in return, but the government's evidence—though largely circumstantial—was compelling and entirely without innocent explanation. Before the March 8 transaction, the FBI searched Worthen and equipped him with buy money and a recording device. They conducted visual surveillance and listened in as Gaytan and Worthen discussed Worthen's interest in buying "a couple O's of rock." Gaytan offered "O's," or ounces, at a price of "six bills" per ounce. Gaytan worried

that the police were watching and arranged to move the transaction to a different location. Gaytan then confirmed that Worthen wanted "smoking cane." Later, Worthen can be heard audibly counting the buy money, and once Gaytan was paid, Gaytan agreed to get "the other one," or the second ounce of crack cocaine. Gaytan is then heard leaving the car, and when he returned, he said to Worthen, "This one's good." When Worthen rejoined the agents after the transaction was completed, he no longer had the buy money but was in possession of two separate ounce-sized quantities of crack cocaine.

The April 19 transaction proceeded in much the same way, except that this time the jury heard portions of recorded calls between Worthen and Gaytan arranging a time and place for the exchange. Again, before the controlled buy, the FBI searched Worthen, gave him the agreed-upon buy money, and fitted him with a recording device. Gaytan and Worthen then met at the agreed location, again discussed price, and Gaytan took Worthen to a more secluded location in the alley behind his home. When they arrived in the alley, Gaytan told Worthen, "[J]ust get the money ready, I'll go get it." Gaytan is then heard leaving the car, returning a moment later, telling Worthen, "[I]t's right there in the alley," and driving off. When Worthen rejoined the agents moments later, he (again) no longer had the buy money and (again) was in possession of two ounce-sized quantities of crack cocaine.

This evidence is sufficient to sustain Gaytan's convictions. That the agents could not see the hand-to-hand transactions does not mean that the government

had to call Worthen to connect the dots. In *United States v. Tavarez*, 626 F.3d 902 (7th Cir. 2010), we rejected a similar challenge to the sufficiency of the evidence in a controlled-buy case in which the confidential informant did not testify and "[n]one of the witnesses actually saw [the defendant] physically deliver [any drugs]." *Id.* at 905-06. A surveillance video showed the informant entering the building where the transaction was to take place, and he later emerged with methamphetamine. *Id.* at 906. The defendant's fingerprint was found on the bag containing the drugs, and the buy money was found in the pocket of a jacket in his bedroom closet. *Id.* The circumstantial evidence in this case is different but even stronger than that in *Tavarez*. Here, unlike in *Tavarez*, the controlled buys were fully captured on audio recordings. Gaytan's own statements on the recordings, together with the physical evidence and the case agents' testimony about the surrounding circumstances, unmistakably establish Gaytan's guilt; this evidence is not susceptible of an innocent explanation. *See United States v. Hendrix*, 482 F.3d 962, 966 (7th Cir. 2007) (explaining that our focus is on what the jury could reasonably infer from the evidence, not far-fetched theories about ways an informant could have obtained a controlled substance that lack evidentiary support). Even without Worthen's testimony, the evidence was easily sufficient to convict.

## B. Confrontation Clause and Rule 403 Claims

Gaytan next argues that two of Worthen's statements on the audio recordings were testimonial hearsay, im-

plicating his Sixth Amendment right to confront the witnesses against him. Worthen was not an unavailable witness, and Gaytan contends that admitting two of his recorded statements violated the Confrontation Clause as explained in *Crawford*. He also claims that the case agents' testimony about the recordings was unfairly prejudicial and should have been excluded under Rule 403 of the Federal Rules of Evidence. On the Confrontation Clause claim, our review is de novo. *United States v. Turner*, 591 F.3d 928, 932 (7th Cir. 2010). Gaytan's Rule 403 argument is new on appeal; we review forfeited evidentiary issues for plain error.[1] *United States v. Rangel*, 350 F.3d 648, 650 (7th Cir. 2003).

### 1. Confrontation Clause

Gaytan concedes that most of Worthen's recorded statements were admissible and do not implicate *Crawford*. His Confrontation Clause argument focuses on two statements that he claims were testimonial and offered for their truth. The Sixth Amendment provides that an

---

[1] In the district court, Gaytan generally objected on Rule 403 grounds to the admission of Worthen's statements on the recordings, but his Rule 403 argument on appeal is different. Here, he claims unfair prejudice stemming from the FBI agents' testimony about the recordings, not the admission of the recordings themselves. To preserve an evidentiary error for appellate review, the objecting party must state the specific basis for the objection. Because Gaytan's Rule 403 argument has changed, our review is for plain error. *United States v. Rangel*, 350 F.3d 648, 650-51 (7th Cir. 2003).

accused has "the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Admitting a witness's out-of-court testimonial statements when that witness is available to testify violates the accused's Sixth Amendment right of confrontation, but not when those statements are offered for a purpose "other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9.

Gaytan's *Crawford* argument focuses on the following passage from the recording of the March 8 transaction:

> Worthen: . . . *My brother just came with some dude who's tr-, trying to get two ounces of rock. . . .*
>
> Gaytan: What you need? . . .
>
> Worthen: *I'm trying to get, f—ing um, a couple O's of rock, man.*
>
> Gaytan: Where the loot at? . . .
>
> Worthen: How much do I need, for each ounce? . . .
>
> Gaytan: I'll give it to you, I'll give it to you for six bills, dog.

(Emphasis added.) Gaytan claims that the two italicized statements were testimonial and offered for the truth: that is, that Worthen was seeking crack cocaine and not some other substance.

There's no doubt that these statements were testimonial; Worthen made them with the knowledge that FBI agents were recording the conversation "in anticipation of or with an eye toward a criminal prosecution" of Gaytan. *See United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006). But the two statements do not qualify

as hearsay because they were not offered for their truth. The Confrontation Clause only comes into play where "the defendant ma[kes] a showing that the [g]overnment offered the declarant's statements for the truth of the matter asserted." *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007). As we have explained, a confidential informant's out-of-court statements are not hearsay if they are offered not for the truth but to put the defendant's statements in context or to make what he said and did in reaction to the informant's statements intelligible to the jury. *See, e.g.*, *United States v. Bermea-Boone*, 563 F.3d 621, 626 (7th Cir. 2009); *Tolliver*, 454 F.3d at 666.

Here, the government offered the challenged statements not for their truth but to put Gaytan's own words in context and to help the jury make sense out of his reaction to what Worthen said and did. Gaytan's responses "[w]hat you need?" and "[w]here the loot at?" would have been unintelligible without the context provided by Worthen's statements about his or his brother's interest in "rock" or "a couple O's of rock." *See United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009) (informant's statement "Just bring me nine" was admissible to place defendant's response "You want me to cook it?" in context). These statements were not being offered to show that some "dude" with Gaytan's brother *actually* wanted to buy two ounces of "rock"; the statements were offered to show their effect on the listener, Gaytan. In other words, they were offered to put Gaytan's response in context—to show he understood Worthen was looking for crack and responded accordingly. Moreover, at several points during the trial, the district court told the

jury that Worthen's recorded statements were not to be considered for their truth but only to provide context for Gaytan's own statements. *See United States v. Van Sach*, 458 F.3d 694, 701-02 (7th Cir. 2006) (finding no Confrontation Clause violation and emphasizing that "the court gave the jury a limiting instruction, explaining that the CI's statements were only to provide context for the defendant's admissions").

We have held that admitting a confidential informant's out-of-court statements might implicate the Confrontation Clause if the circumstances suggest that the informant used those statements to "put words into [a defendant's] mouth." *See Nettles*, 476 F.3d at 518. This is not such a situation. It is true that Worthen, not Gaytan, initiated the March 8 drug transaction, but nothing about the recorded conversation suggests that Worthen was putting words in Gaytan's mouth. Worthen's references to "rock" did not, as Gaytan argues, inculpate Gaytan in a way he would not have been otherwise. The government was not required to prove that Worthen actually wanted to buy "rock"; the government was required to prove that Gaytan knew he was distributing a controlled substance. *Unites States v. Barlow*, 310 F.3d 1007, 1012 (7th Cir. 2002) ("[A]ctual knowledge of the identity of a drug is not an element of 21 U.S.C. § 841(a)."). In short, the challenged statements were offered to help the jury make sense of Gaytan's abbreviated and coded responses to Worthen. Accordingly, the district court properly admitted Worthen's out-of-court statements—not for their truth but to contextualize Gaytan's own statements without putting words in his mouth. There was no Confrontation Clause violation.

### 2. *Prejudice under Rule 403*

Gaytan also argues that the FBI agents should not have been permitted to testify about Worthen's statements when Worthen himself could have been called as a government witness. Gaytan frames this as a Rule 403 argument; relevant evidence may be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. Gaytan relies on the principle that a court may abuse its discretion by admitting a highly prejudicial form of evidence when a much less prejudicial but equally probative alternative is available. *Old Chief v. United States*, 519 U.S. 172, 191-92 (1997) (district court abused its discretion under Rule 403 in admitting full record of defendant's prior conviction when it could have instead admitted a stipulation that he had a prior conviction). He claims he was unfairly prejudiced when the district court let the FBI agents testify about what occurred out of their sight during the controlled transactions when the less prejudicial alternative of calling Worthen to testify was available.

The *Old Chief* analogy is inapt. This is not a case in which a highly prejudicial form of evidence was admitted when another, less prejudicial form was available. The agents readily admitted that they did not actually see money and drugs change hands. In her testimony in connection with the March 8 transaction, Agent Hall admitted that she did not personally observe the transfer of drugs and that the video recording was of poor quality and did not show the exchange. Likewise, Agent Moreland testified that he did not personally observe

Gaytan exchange drugs for money on April 19. That they did not see the hand-to-hand transactions does not diminish the overall probative value of their testimony or make it unfairly prejudicial for them to testify about what they heard on the recordings. They observed most of what occurred and heard what was happening through the transmitter. Gaytan's attorney fully explored the limits of agents' surveillance on cross-examination. There was no unfair prejudice.

Gaytan's position seems to be that only Worthen could answer certain questions about what happened during the controlled buys. This is essentially a reframing of the sufficiency-of-evidence challenge, which we have already rejected. There is no categorical rule that the government must produce its confidential informant to testify against a defendant. *See, e.g.*, *Hendrix*, 482 F.3d at 967 (failure to call informant did not entitle defendant to new trial). There was no Rule 403 error here, let alone a plain error.

## C.  Agent Moreland's Testimony About the Recordings

Finally, Gaytan objects to a short line of inquiry during Agent Moreland's testimony after the government played a portion of the April 18 recorded phone call in which Worthen reminded Gaytan that he had recently "got those two big ones" from Gaytan. The prosecutor asked Agent Moreland how he knew from this exchange "that the deal was on for the next day for two ounces of crack cocaine." Agent Moreland responded:

> Because the source initially asked for "two big ones" and referred to a previous drug purchase on March 8,

> 2006. The defendant responded, "Yeah." And when
> the source [set] the time at 2 o'clock, the defendant
> asked, "For sure?" And the source said, "Yes." And
> they agreed on the time of 2 o'clock.

Gaytan characterizes this response as expert testimony about the meaning of the phrase "two big ones" in narcotics parlance. Because the government did not qualify Agent Moreland as an expert under Rule 702 of the Federal Rules of Evidence, Gaytan argues that permitting him to testify about the meaning of "two big ones" was error. He did not object to this part of Agent Moreland's testimony below, so again our review is for plain error. *See Rangel*, 350 F.3d at 650.

The government characterizes Agent Moreland's testimony as permissible lay-opinion testimony under Rule 701, which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701. A law-enforcement officer's testimony is a lay opinion if it is "limited to what he observed . . . or to other facts derived exclusively from [a] particular investigation." *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007). On the other hand, an officer testifies as an expert when he brings "the wealth of his experience as a narcotics officer to bear on those observations and

ma[kes] connections for the jury based on that specialized knowledge." *Id.* We have held that translating "drug jargon and code words that might seem entirely innocuous to an untrained jury" is expert testimony under Rule 702. *York*, 572 F.3d at 423.

In *York* the government properly identified and qualified an officer who testified as an expert to interpret the defendant's recorded drug-coded language, but then elicited problematic "dual" testimony from another officer about drug jargon, essentially treating the second officer as both a fact witness and an expert. *See id.* at 423-27. We held that eliciting the "dual" testimony from the officer was error. *Id.* at 426. Here, as in *York*, the government identified a law-enforcement expert (Officer Coleman) who would offer opinion testimony about the meaning of the drug code in the audio recordings. The government did not identify or qualify Agent Moreland as an additional expert for this purpose, but unlike the second officer in *York*, Moreland was never treated as a dual-capacity witness. He was not asked to define "two big ones" or any other coded language on the recordings.

Perhaps Agent Moreland's testimony can be understood to contain an *implicit* expert opinion. He explained that he knew the April 19 deal would involve two ounces of crack cocaine based on the April 18 recorded conversation, which contained a discussion of Worthen's earlier request for "two big ones." This testimony suggests that the reference to "two big ones" meant two ounces of crack cocaine, and Moreland's familiarity with this terminology might have been attributable to the

Gaytan investigation in particular or to his training and experience as a narcotics officer in general, or perhaps both. *See York*, 572 F.3d at 423; *Oriedo*, 498 F.3d at 603. Admitting dual expert and lay testimony by a witness generally requires precautionary instructions to the jury. *See United States v. Parra*, 402 F.3d 752, 760 (7th Cir. 2005) (if a witness testifies in a dual capacity, the court should give "cautionary instructions"); *see also York*, 572 F.3d at 426 (court erred in admitting agent's expert interpretations of code words in the midst of his lay testimony without flagging for the jury that he was now testifying in his expert role).

We need not decide whether Agent Moreland's testimony about "two big ones" crossed the line and amounted to expert testimony. Under a plain-error standard, a defendant's conviction will stand if the claimed evidentiary error was harmless. *York*, 572 F.3d at 429. "Harmlessness means that the jury would have convicted even absent the error[]." *Id.* As we have noted, the evidence in this case, though mostly circumstantial, was very strong. The government did not rely on Agent Moreland's testimony to interpret Worthen's reference to "two big ones" or to establish that the substance Gaytan distributed was in fact crack cocaine. In closing argument the prosecutor referred to the April 18 recording not to establish the meaning of "two big ones" or to highlight Agent Moreland's testimony, but instead to remind the jury that Worthen "[was] talking about that March deal." In *York* we held that an error in admitting an officer's dual testimony as both a transactional witness and an expert on drug jargon was harmless (and thus not plain error); we found it "impossible" to conclude that the

exclusion of this small portion of the agent's testimony "would have caused the jury to reach a different verdict." *Id.* at 429-30. The same is true here. Even if Agent Moreland's comment about "two big ones" was improper expert opinion, the admission of this small bit of testimony does not qualify as plain error.[2]

AFFIRMED.

---

[2] In his opening brief, Gaytan sought to preserve his right to petition the district court to reduce his sentence should the Fair Sentencing Act of 2010 ("FSA"), Pub. L. No. 111-220, 124 Stat. 2372, or the corresponding amendments to the sentencing guidelines be applied retroactively. We have since held that the FSA is not retroactive. *United States v. Fisher*, 635 F.3d 336, 340 (7th Cir. 2011); *United States v. Bell*, 624 F.3d 803, 814-15 (7th Cir. 2010). On July 1, 2011, the Sentencing Commission announced that its amendments to the crack-cocaine sentencing guidelines would become retroactive effective November 1, 2011, absent congressional action to the contrary. *See* News Release, U.S. Sentencing Commission, U.S. Sentencing Commission Votes Unanimously to Apply Fair Sentencing Act of 2010 Amendment to the Federal Sentencing Guidelines Retroactively (June 30, 2011), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_Releases/20110630_Press_ Release.pdf. The effect of these amendments on Gaytan's sentence is a matter for the district court on a motion for sentence modification pursuant to 18 U.S.C. § 3582(c)(2).